# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| SHERIE HERNANDEZ, | ) | CASE NO. 1:18CV2150 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Sherie Hernandez ("Plaintiff" or "Hernandez"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her

applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the

reasons set forth below, the Commissioner's final decision is VACATED and REMANDED for

further consideration consistent with this opinion**.**

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

In June 2013, Hernandez filed an application for POD, DIB, and SSI alleging a disability onset date of December 1, 2012 and claiming she was disabled due to leg surgeries for poor circulation, diabetes, high blood pressure, high cholesterol, a blood infection, and depression. (Transcript ("Tr.") at 263, 265, 304.)  The applications were denied initially and upon reconsideration, and Hernandez requested a hearing before an administrative law judge ("ALJ"). (Tr. 180, 191, 210, 215.)

On June 2, 2015, an ALJ held a hearing, during which Hernandez, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 47.)  On August 5, 2015, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 22.)  The ALJ's decision became final on July 18, 2016, when the Appeals Council declined further review.  (Tr. 1.)

Hernandez subsequently filed a Complaint in the Northern District of Ohio, challenging the August 5, 2015 ALJ decision.  On April 4, 2017, the Northern District of Ohio remanded the case for further administrative proceedings.  (Tr. 2103.)  The Appeals Council then remanded the matter back to an ALJ.  (Tr. 2158.)

On March 12, 2018, an ALJ held a hearing, during which Hernandez, represented by counsel, and an impartial VE testified.  (Tr. 2069.)  On July 13, 2018, the ALJ issued a written decision, again finding Hernandez was not disabled.  (Tr. 2041.)

On September 18, 2018, Hernandez filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 16.)  Hernandez asserts the following assignments of error:

(1)     The physical residual functional capacity determination is unsupported by substantial evidence because the ALJ failed to properly evaluate the medical opinion evidence.

(2)     The Step 5 determination is unsupported by substantial evidence because the ALJ relied upon an incomplete hypothetical question asked to the vocational expert.

(Doc. No. 13.)

## II.   EVIDENCE

### A.     Personal and Vocational Evidence

Hernandez was born in July 1975 and was forty-two years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 2059.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a wheelchair attendant.  (*Id.*)

### B.     Relevant Medical Evidence[2]

On November 21, 2012, Hernandez visited vascular surgeon Christopher Smith, M.D., because she had an abnormal non-invasive vascular study.  (Tr. 461.)  Hernandez described bilateral calf pain precipitated by walking less than a block.  (*Id.*)  On examination, Hernandez had ulcers in both of her lower extremities.  (Tr. 462.)  Dr. Smith diagnosed peripheral vascular disease with moderate distal ischemia on the right side and severe distal ischemia on the left side.  (Tr. 463.)  The doctor ordered an MR angiogram of the bilateral lower extremities.  (*Id.*)

A December 4, 2012 MR angiogram of the bilateral legs revealed the following: (1) extensive venous contamination limits of the vessels distal to the ankle; (2) multiple areas of

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

short segment, high grade stenosis, with distal reconstitution at the popliteal artery above the knee in the right superficial femoral artery; (3) likely occlusion of the right and left posterior and tibial artery; (4) occlusion of the right peroneal artery and left superficial femoral artery; and (5) serpiginous marrow enhancement with the proximal and distal tibial shaft, associated with some suspectibiliy.  (Tr. 467.)

Hernandez was then hospitalized from December 26 – 28, 2012 in order to undergo a femoral-popliteal bypass in the left leg.  (Tr. 454.)  A January 2, 2013 left foot x-ray was negative for osteomyelitis or fracture.  (Tr. 502.)

On March 19, 2013, Hernandez presented to the emergency room with a sharp, stabbing right leg pain.  (Tr. 404.)  The emergency room physicians noted she was scheduled for right leg surgery that week and provided her with Percocet for pain control.  (Tr. 404, 406.)  Hernandez was subsequently hospitalized from March 21 – 24, 2013 for a right leg popliteal bypass with a graft.  (Tr. 399, 396.)

Following this procedure, Hernandez developed an infection at the site of the surgical incision.  (Tr. 388.)  She was hospitalized from May 6 – 8, 2013 to obtain IV antibiotic treatment.  (Tr. 387.)  A peripheral vascular study conducted during this hospital stay revealed widely patent bilateral leg bypass grafts and no ischemia in either leg or foot.  (Tr. 388.)

On May 22, 2013, Hernandez followed up with Dr. Smith, her vascular surgeon.  (Tr. 363.)  On examination, she has a stable right heel wound, a nearly healed left foot wound, and a clean right leg wound.  (*Id*.)  Dr. Smith advised her to continue with wound care and return in a month.  (*Id*.)

Hernandez returned to the emergency room on June 27, 2013 for right leg and calf pain. (Tr. 544.) Her right leg felt "cold" and her pain increased with elevation of her right foot. (*Id*.) Her right thigh wound exhibited minimal drainage. (*Id*.) On examination, Hernandez had trace edema in her right leg and her right foot was cool to touch. (Tr. 545.) Her distal capillary refill was delayed and she had decreased sensation. (*Id*.) Hernandez was subsequently admitted to the hospital for a "cold, pulseless right foot" and underwent an angioplasty of her thrombosed right femoral-popliteal bypass graft. (Tr. 587.) The pulse returned to Hernandez's foot following this procedure. (Tr. 588.)

On July 11, 2013, Hernandez underwent an arterial thrombolysis procedure which confirmed (1) thrombosis of the right femoral-popliteal bypass graft and (2) successful placement of an infusion catheter across the graft. (Tr. 594.)

On August 28, 2013, Hernandez required hospitalization because she again had no signal in her right foot. (Tr. 668-669.) She underwent a surgical revision of her right leg graft. (Tr. 665.) By the end of her hospital stay, she was able to ambulate with assistance. (Tr. 668-669, 665.)

From September 16 – 22, 2013, Hernandez was hospitalized for debridement of a right heel ulcer and a wound vac placement. (Tr. 657, 658.) She was discharged with home health care services. (Tr. 658.) An October 2, 2013 right heel x ray confirmed osteomyelitis. (Tr. 655.)

On October 16, 2013, Dr. Smith filled out a form entitled "Residual Functional Capacity Questionnaire" regarding Hernandez. (Tr. 1046-1047.) Dr. Smith found the following limitations for Hernandez:

- she cannot walk a city block without pain;

- she can sit for 60 minutes at one time and for 1 hour total in an 8-hour workday;

- she can stand/walk for 5 minutes at one time and cannot stand for an hour total in an 8-hour workday;

- she requires unscheduled 15-minute breaks about every 15 minutes;

- she cannot lift 10 pounds;

- she can use arms, hands, and fingers for 100% of the day for repetitive reaching, handling, and fingering;

- she would miss work more than four times a month; and

- she is not capable of working 8 hours a day, 5 days a week on a sustained basis.

(*Id.*)

Hernandez returned to Dr. Smith on November 5, 2013 for her right heel ulcer.  (Tr. 623.) At that time, Hernandez was on IV antibiotics and a nurse visited her home twice a week.  (*Id.*) Dr. Smith advised Hernandez to not bear any weight on her right heel.  (*Id.*)

On November 19, 2013, Hernandez visited vascular surgeon John Francis, M.D., for her right heel ulcer.  (Tr. 611.)  Dr. Francis noted Hernandez's ulcer had improved and she no longer required IV antibiotics.  (*Id.*)  Hernandez continued to take oral antibiotics and not bear weight on her right foot.  (*Id.*)  Dr. Francis recommended Hernandez continue to change her wound dressings and not bear weight on her right foot.  (Tr. 612.)

Hernandez continued to receive home health care throughout this period.  (Tr. 923.)  Her home health care provider assisted her with personal care, bathing, dressing, light housekeeping, meal preparation, and laundry.  (*Id.*)  This care was briefly suspended on March 11, 2014

because of a hospital admission. (Tr. 941.) On that date, Hernandez underwent a duplex scan of her right femoral-popliteal bypass graft, which confirmed inflow stenosis and no dopplar signal. (Tr. 1049.) Hernandez was then hospitalized through March 13, 2014 for a "significant stenosis at the level of the inflow vessel" and a "threatened limb." (Tr. 1060.)

During this hospitalization, Hernandez underwent a balloon angioplasty of the right leg graft and a left arm PICC line placement. (Tr. 1061.) She also received IV antibiotics and wound care. (*Id.*) Upon discharge, she resumed her home health care services and was unable to fully bear weight on her right leg. (Tr. 1060.)

On March 17, 2014, Hernandez underwent another surgical procedure, a right femoral endartectomy and bovine patch angioplasty. (Tr. 1248.) Hernandez continued to have home health care service certification through May 11, 2014. (Tr. 1463.)

Hernandez visited vascular surgeon Jeffrey Alexander, M.D. on May 13, 2014. (Tr. 1449.) She had "generally been doing well" but ambulated with the assistance of a walker. (*Id.*) Dr. Alexander noted Hernandez had a right foot drop and a right heel ulcer. (*Id.*) On examination, Hernandez could not bear weight on her right heel. (*Id.*) Her right foot was warm, but Dr. Alexander could not feel her pedal pulses. (*Id.*) Dr. Alexander referred Hernandez to physical therapy. (*Id.*)

On May 16, 2014, Dr. Alexander completed a "Residual Functional Capacity Questionnaire" on behalf of Hernandez. (Tr. 708-709.) Dr. Alexander found the following limitations for Hernandez:

- she could walk less than a block without pain;

- she can sit for 30 minutes at a time and 3 hours total in an 8-hour workday;

- she can stand/walk for 5 minutes at a time and 1 hour total in an 8-hour workday;

- she requires a job that permits shifting positions at will from sitting, standing, and walking;

- she needs to take 1-2 unscheduled breaks during a workday, each lasting 15-20 minutes at a time;

- she can occasionally lift less than 10 pounds and she can never lift 10 pounds or more;

- she does not have any repetitive handling, reaching, and fingering limitations;

- she will miss work 1-2 times a month; and

- she is not physically capable of working 8 hours a day, five days a week on a sustained basis.

(*Id.*)

Hernandez had a physical therapy appointment with Margo McGreal, P.T., on May 29, 2014.  (Tr. 1432.)  Hernandez reported she had been trying to put her right foot down when she walked and found it to be more painful in her knee than her ankle.  (*Id.*)  She did report improvement in her pain levels.  (Tr. 1432.)  Ms. McGreal noted "marked improvements in range and gait," but Hernandez continued to require crutches for ambulation.  (Tr.1433.)

A June 4, 2014 60-day summary of her home health care services revealed Hernandez required assistance to get up and move safely and exhibited "considerable [and] taxing effort to leave home."  (Tr. 961.)  She continued to require assistance with personal care, homemaking, and activities of daily living.  (*Id.*)  Her homehealth care worker generally visited 6 days a week and would perform bathing, meal preparation, and mobility assistance.  (Tr. 1022, 1023.)

During a June 30, 2014 physical therapy appointment, Hernandez reported she was "feeling a lot better" and her leg felt "more loose." (Tr. 1390.) She denied any pain and presented to her appointment without any assistive device. (Tr. 1390-1391.) She was able to walk on the treadmill with a "more normalized gait pattern." (Tr. 1392.) Her physical therapist ordered Hernandez a standard cane to help "match her pace and give her support for balance." (*Id.*)

On July 18, 2014, Dr. Alexander completed another "Residual Functional Capacity Questionnaire" on behalf of Hernandez. (Tr. 715-716.) He found the following limitations for Hernandez:

- she can walk one city block without rest or significant pain;

- she can sit for 30 minutes at one time and stand/walk for 5-10 minutes at one time;

- she can sit for four hours total in an 8-hour workday;

- she can stand/walk for 1 hour total in an 8-hour workday;

- she requires a job that allows for shifting positions at will from sitting, standing, and walking;

- she will need to take 1-2 unscheduled 15-minute breaks during the workday;

- she can occasionally lift up to 10 pounds and never lift 20 pounds;

- she does not have any reaching, handling, or fingering limitations;

- she will be absent from work 1-2 times a month; and

- she is not capable of maintaining an 8-hour a day, 5 days a week work schedule on a sustained basis.

(*Id.*)

An October 3, 2014 60-day home health care summary indicated Hernandez continued to have an unsteady gait and require assistance with her activities of daily living. (Tr. 953.) She remained certified for home health care services through February 3, 2015. (Tr. 944.) Hernandez cancelled her home health care services on December 25, 2015 and January 1, 2015 and refused any home health care services on January 17, 2015. (Tr. 948, 947.) A home health care summary from January 28, 2015 indicated she continued to require assistance with her activities of daily living and had an unsteady gait. (Tr. 949.) A February 4, 2015 60-day home health care summary revealed she required assistance with personal care, home environment safety, and meal preparation. (Tr. 943.)

On February 28, 2015, Hernandez visited the emergency room for worsening claudification pain on the left side. (Tr. 1495.) She could not walk more than 5-10 feet. (*Id*.) Her left leg was cold and numb below her ankle, but she still had some sensation. (*Id*.) Hernandez required hospitalization through March 8, 2015 for this issue. (Tr. 1501.) A duplex ultrasound of her left leg revealed a complete occlusion. (*Id.*) She underwent catheter directed lysis and her left foot signal improved. (*Id*.) Upon discharge, Hernandez resumed home health care services and in-home physical therapy. (*Id*.)

During her April 13, 2015 physical therapy visit, Hernandez was "feeling better overall." (Tr. 2026.) She ambulated with a quad cane and requested a straight cane. (*Id*.) Her physical therapist noted Hernandez was "balance challenged with tandem walking," "required fingertip support on the parallel bars," but was able to safely ambulate with a straight cane. (Tr. 2027.)

Hernandez visited vascular surgeon Matthew Allemang, M.D., on April 22, 2015. (Tr. 2001.) She indicated she had been doing well since her hospitalization, with physical therapy

twice a week and a home health aide to help "with things around the house." (*Id.*) Dr. Allemang noted Hernandez was on "lifetime anticoagulation to help with bypass patency." (*Id.*)

On May 8, 2015, Hernandez's walking was improved during her physical therapy appointment. (Tr. 1975.) She was able to do her exercises with a straight cane. (Tr. 1976.) However, while she was making "good improvements in objective measurements," she displayed "no significant improvement" in functional ability. (*Id.*)

On August 3, 2016, Hernandez visited primary care doctor Katherine Jones, D.O. (Tr. 2312.) Dr. Jones noted Hernandez was "significantly overdue for many health care maintenance items" and had not had any labwork for the past seven months. (*Id.*) Hernandez admitted she had discontinued her anticoagulation medication and stopped visiting the anticoagulation clinic. (*Id.*) Her blood sugar was uncontrolled, but she was wearing diabetic shoes and denied pain at the site of her old ulcers. (*Id.*) Hernandez explained to Dr. Jones she had difficulty obtaining transportation to her appointments and her sister had recently passed away. (*Id.*) Dr. Jones referred Hernandez to endocrinology and the anticoagulation clinic. (Tr. 2313.) Dr. Jones advised Hernandez her home health care nurse needed to check her INR levels. (*Id.*)

Hernandez returned to Dr. Jones on June 14, 2017. (Tr. 2324.) She reported her home health nurse needed an order for coumadin labwork. (*Id.*) Dr. Jones noted Hernandez continued to be overdue for many appointments, as she had not seen a vascular specialist since April 2015 and had not seen an endocrinologist in the past year. (*Id.*) Hernandez again cited transportation difficulties to explain her lack of follow-up with her doctors. (*Id.*) Dr. Jones referred Hernandez to vascular surgery, the anticoagulation clinic, and an endocrinologist. (Tr. 2325.) Hernandez did begin to visit the anticoagulation clinic to have her INR level monitored. (Tr. 2373, 2378.)

On October 12, 2017, Dr. Jones observed Hernandez still had not followed up with her vascular surgeon. (Tr. 2383.) On examination, Hernandez displayed no edema, but had a scar from her heel infection. (*Id.*) There were no other signs of infection. (*Id.*) Dr. Jones again referred Hernandez to vascular surgery. (Tr. 2384.)

That same date, Dr. Jones filled out an "Ability to Participate" form regarding Hernandez. (Tr. 2270-2271.) Dr. Jones observed Hernandez had difficulty ambulating and poor balance. (Tr. 2270.) She found Hernandez had the following limitations:

- she can sit for a maximum of two hours without a break;

- she can stand and walk for less than one hour during a workday;

- she can climb stairs and ladders for 10 minutes or less during a workday;

- she cannot kneel, squat, bend, or stoop;

- she can push and pull for two hours during a workday and only while sitting;

- she can use a keyboard for 8 hours during a workday;

- she can lift 5 pounds or less for 2 hours during the workday;

- she has no deficits in interacting with others, maintaining socially acceptable behaviors, being aware of hazards, understanding and remembering short and simple instructions, sustaining a routine without frequent supervision, and maintaining basic standards of personal hygiene and grooming;

- she has mild deficits in remembering location and work procedures, maintaining attention for extended periods; making simple work-related decisions, and performing at a consistent pace: and

- she can participate in classroom-based work, educational activities, vocational rehabilitation, skill training within her health-related restrictions, volunteer work, and job searching.

(Tr. 2270-2271.)

**C.      State Agency Reports**

**1.      Mental Impairments**

On July 25, 2013, Hernandez underwent a consultative examination with psychologist David V. House, Ph.D.  (Tr. 351.)  She denied any mental health treatment.  (Tr. 353.)  She was ambulating with crutches and her ambulation was "very fragile and difficult."  (Tr. 354.)  She described poor sleep, crying spells, and suicidal ideation.  (*Id*.)  Hernandez indicated she had panic attacks 1-2 times a week.  (Tr. 355.)  She also reported ideas of reference and auditory hallucinations.  (*Id*.)

During the evaluation, Hernandez's pace was "a bit slow" and she had difficulty completing tasks.  (Tr. 356.)  Her long term memory was intact.  (*Id*.)  Based upon this evaluation, Dr. House diagnosed Hernandez with mood disorder secondary to type I diabetes, bereavement, and panic disorder without agoraphobia.  (Tr. 357.)  Dr. House then provided the following assessment of Hernandez:

> **1. Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions**:  Ms. Hernandez's memory function is intact for the long term.  It is a bit less intact for short-term memory, connected to concentration and attention.  Likely she can follow instructions, at least to some degree, but more so the evaluator would believe that, given her levels of distractibility, her capabilities would be inconsistent.
>
> **2.  Describe the claimant's abilities and limitations in maintaining attention and concentration and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks**:  As with her memory function, she seems to have some limits on her concentration and attention and these would result in inconsistent response pattern, especially for multi-step directions.  There are times that she would be able to perform multi-step directions and remember instructions.

**3. Describe the claimant's abilities and limitations in responding appropriately to supervision and coworkers in a work setting:** Ms. Hernandez is more socially isolated because she has trouble getting around, especially on crutches. She seems socially outgoing (although she is depressed and experiencing frequent panic attacks). She is not hostile or obstructionistic towards others.

**4. Describe the claimant's abilities and limitations in responding appropriately to work pressures and work settings:** It seems as though her ability to respond with any emotional resilience is declining over time. She was somewhat tearful and seemingly fragile during the evaluation. She has gone through a recent anniversary date of the death of her recently born daughter at the end of June. However, the episode actually occurred 16 years ago. It appears to the evaluator that likely she would be dysfunctional and disruptive in a work environment due to emotional reasons.

(Tr. 357-358.)

On August 13, 2013, state agency psychologist Tonnie Hoyle, Psy.D., reviewed Hernandez's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 117-118; 121-123.) Dr. Hoyle concluded Hernandez had (1) mild restrictions in her activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation. (Tr. 117.) As for her mental RFC, Dr. Hoyle opined Hernandez was moderately limited in her abilities to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) interact appropriately with the general public; and (4) respond appropriately to changes in the work setting. (Tr. 121-122.) Dr. Hoyle found no significant limitations in any other area. (*Id*.) Dr. Hoyle explained the basis of her conclusion as follows:

[Claimant] is [capable] of performing routine tasks in a setting that is relatively static and requires only brief and superficial contact with others.

(Tr. 122-123.)

On December 5, 2013, state agency physician Bruce Goldsmith, Ph.D., reviewed Hernandez's medical records and completed a PRT and Mental RFC Assessment. (Tr. 149-150; 153-155.) Dr. Goldsmith generally adopted the opinion of Dr. Hoyle, but added Hernandez would be moderately limited in her abilities to (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest period and (2) accept instructions and respond appropriately to criticism from supervisors. (Tr. 153-155.) Dr. Goldsmith explained the basis of his conclusion as follows:

> [Claimant] is limited to simple to moderately complex tasks that are not fast paced or have unusual production demands.
>
> ***
>
> [Claimant] is limited to occasional and superficial interpersonal contact.
>
> ***
> [Claimant] is limited to routine tasks with infrequent changes.

(*Id*.)

### 2.     Physical Impairments

On July 17, 2013, Hernandez underwent a consultative examination with physician Hasan Assaf, M.D. (Tr. 519.) She reported a twenty year history of diabetes, high blood pressure, and multiple vascular surgeries and related infections. (*Id.*) She also described ulcers on her feet and heels. (*Id.*) She indicated she "does not do any cooking, cleaning, or laundry because she cannot stand for any period of time." (Tr. 520.)

Upon examination, Hernandez used two crutches to stand and ambulate and could not "stand or walk without the use of the two crutches" or "walk on heels and toes." (Tr. 521.) Dr.

Assaf concluded the use of these crutches was necessary and observed Hernandez required help changing for the exam and getting on and off the examination table.  (*Id*.)  Hernandez had an open wound on her right thigh, an infected ulcer on her right heel, a healed ulcer on the right foot, and an infected ulcer on her left heel.  (*Id*.)  The range of motion in her cervical spine, shoulders, elbows, hands, and fingers were all normal.  (Tr. 525-526.)  Her lumbar spine range of motion was unable to be tested because Hernandez could not stand unsupported.  (Tr. 526.)

Based upon this examination, Dr. Assaf opined Hernandez had "marked limitations in activities requiring standing, walking, and weightbearing."  (Tr. 523.)

On September 3, 2013, state agency physician Anahi Ortiz, M.D., reviewed Hernandez's medical records and completed a Physical RFC assessment.  (Tr. 120-121.)  Dr. Ortiz determined Hernandez could lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 4 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 119.)  She further found Hernandez could push and pull occasionally with the lower extremities.  (*Id*.)  Dr. Ortiz opined Hernandez could occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, and frequently balance, stoop, kneel, crouch, and crawl.  (Tr. 120.)  The doctor concluded Hernandez would need to avoid all exposure to unprotected heights and hazardous equipment.  (Tr. 120-121.)

On January 28, 2014, state agency physician Elizabeth Das, M.D., reviewed Hernandez's medical records and completed a Physical RFC assessment.  (Tr. 151-153.)  She generally affirmed Dr. Ortiz's findings, but further limited Hernandez to standing and/or walking for 2 hours in an 8-hour workday and no commercial driving.  (*Id*.)

**D. Hearing Testimony**

During the June 2, 2015 hearing, Hernandez testified to the following:

- She lives with her three children. (Tr. 59.) She drives once or twice a month, but generally relies on others for transportation. (Tr. 61.)

- In 2014, she earned $10,000 watching her niece's children. (*Id*.) She would watch them about 25 hours a week. (Tr. 62.) Her daughter would help care for them. (Tr. 63.)

- She used to work as a wheelchair runner at the airport. (Tr. 64.) She also worked as a supervisor at the airport. (Tr. 65.)

- She cannot work because she cannot walk for long periods. (Tr. 67.) She has to elevate her feet when she is sitting and her feet swell when she walks. (*Id*.) She spends most of her day laying in bed with a foot elevator. (*Id*.) She takes pain medication every 4-6 hours, but often spends 2-3 hours a day in pain. (*Id*.) The pain is located in her knees and ankles. (*Id*.)

- She lost her entire right heel. (Tr. 73.) She has ulcers on her feet. (*Id*.) She has diabetes and her sugars will run high, despite taking insulin four times a day. (Tr. 76.)

- She has a home health aide who performs her cleaning and cooking. (Tr. 68.) Her home health aide comes daily, but every time she goes to the hospital her services must be renewed. (Tr. 69.)

- She only leaves the home to go to the grocery store and medical appointments. (Tr. 69.) She used to be much more involved with her church. (Tr. 71.)

During the March 12, 2018 hearing, Hernandez testified to the following:

- She lives with her son. (Tr. 2079.) She does not care for any children on a regular basis. (*Id*.) She completed her GED. (Tr. 2080-2081.)

- She used to have custody over her niece's child, but she no longer does because she cannot physically care for her. (Tr. 2081-2082.)

- She has pain in her knees, feet, and hip. (Tr. 2085.) Her pain "comes and goes," but if she moves around a lot, she will "get into a really bad pain." (Tr. 2086.) She spends most of her day laying down in bed. (*Id*.)

17

- She is able to walk about 15-20 feet. (Tr. 2086.) She cannot lift more than five pounds. (*Id.*) She is afraid to have more surgeries. (Tr. 2088.) She is afraid to go to her vascular specialist because she is fearful "they [will] find something else." (Tr. 2089.) She also has difficulty arranging transportation to attend appointments. (Tr. 2090.)

- She ambulates with a walker. (Tr. 2090.) She becomes fatigued with walking. (*Id.*) The walker was prescribed a few years ago. (Tr. 2091.) She has to keep her feet elevated most of the day. (Tr. 2092.)

The VE testified Hernandez had past work as a wheelchair attendant (D.O.T. #355.674-104). (Tr. 2096.) The ALJ then posed the following hypothetical question:

> Further assume that the hypothetical individual is limited as follows, to less than a full range of light, with standing and walking modified to two hours, occasional left and right foot controls, occasional climbing of ramps and stairs, never to climb ladders, ropes, or scaffolds, frequently stoop, kneel, crouch, crawl. Never to be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. The mental limitations to include limited performing simple routine and repetitive tasks, but not at a production rate pace, i.e., assembly line work. Limited to simple work-related decisions in using her judgment and dealing with changes in the work setting, able to occasionally interact with supervisors, coworkers, and the public.

(Tr. 2097-2098.)

The VE testified the hypothetical individual would not be able to perform Hernandez's past work. (Tr. 2098.) The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as a document specialist (D.O.T. #249.587-018) and a food and beverage order clerk (D.O.T. #209.567-014). (Tr. 2098-2099.)

The ALJ then added additional limitations to the hypothetical, including a sedentary range of work and occasionally balancing, stooping, kneeling, crouching and crawling. (Tr. 2099.) The VE testified such an hypothetical individual would also be able to perform the jobs of a document specialist and food and beverage order clerk. (*Id.*)

18

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Hernandez was insured on her alleged disability onset date, December 1, 2012, and remained insured through December 31, 2020, her date last insured ("DLI.") (Tr. 2050.) Therefore, in order to be entitled to POD and DIB, Hernandez must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant has not engaged in substantial gainful activity since December 1, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: peripheral artery disease, peripheral vascular disease, essential hypertension, diabetes, osteomyelitis of the right calceneus, depression, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can occasionally operate right and left foot controls; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. The claimant is limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work related decisions in using her judgment and dealing with changes in the work setting; and able to occasionally interact with supervisors, coworkers, and the public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on July **, 1975 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 2050-2060.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

Hernandez asserts the ALJ failed to properly evaluate the medical opinion evidence, thus rendering the RFC unsupported by substantial evidence.  (Doc. No. 13 at 17.)  Specifically,

Hernandez argues the ALJ "did not provide good reasons for rejecting the opinions of treating vascular surgeons Drs. Alexander[3] and Smith." (*Id.* at 18.) Hernandez observes that despite the ALJ's reference to her "limited treatment" in rejecting these opinions, she "underwent extensive physical therapy, required home health care even through 2017," and "required surgery on at least five occasions." (*Id.* at 20-21.) Hernandez asserts "the opinions of Dr. Alexander and Dr. Smith are highly consistent with even the later evidence of record," noting these doctors are "treating vascular surgeons who personally observe and treated [her] between late 2012 and 2015, often performing surgeries that required home health care, and significant physical therapy, just to help [her] stand on her feet." (*Id.* at 21-22.)

The Commissioner maintains the ALJ properly evaluated the opinions of Drs. Alexander and Smith. (Doc. No. 16 at 13.) He asserts the "ALJ reasonably determined that the physicians' extreme limitations were inconsistent with [Hernandez's] limited treatment." (*Id.*) The Commissioner argues Hernandez's "pain was well controlled with medication," she "was able to care for others while receiving treatment," and she "failed to make appointments or follow-up with the anticoagulation therapy to manage her condition." (*Id.*) The Commissioner contends the "ALJ provided a number of good reasons for discounting the extreme opinions of Drs. Smith and Alexander." (*Id*. at 14.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is

---

[3]     The Court acknowledges Hernandez raised arguments regarding the ALJ's treatment of the opinions of treating physician Dr. Jones and consultative examiner Dr. Assaf. (Doc. No. 13 at 18.) Because the Court is finding the ALJ improperly evaluated the opinions of Drs. Alexander and Smith, it is limiting its discussion and analysis to this opinion in the interests of judicial economy.

not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[4]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[5]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

---

[4]   Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[5]   Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406. Moreover, the "treating physician rule" only applies to *medical opinions*. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. App'x 498, 505 (6th Cir.

2013).  The opinion, however, "is not entitled to any particular weight."  *Turner*, 381 Fed.

App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir.

2014).

As noted *supra*, Dr. Smith, Hernandez's treating vascular surgeon, submitted a medical

opinion regarding Hernandez in October 2013.  (Tr. 1046-1047.)  Dr. Alexander, Hernandez's

other treating vascular surgeon, submitted medical opinions regarding Hernandez in May and

July 2014.  (Tr. 708-709, 715-716.)  At step four of the sequential evaluation, the ALJ

considered these opinions as follows:

> The claimant had several treating providers submit functional assessments
> in support of a finding of disability.  The claimant's treating physician,
> Jeffrey Alexander, M.D., submitted multiple medical assessments and
> found that the claimant was incapable of performing sedentary work
> activity on a regular and continuing basis due to her severe impairments.
> (Exs. 7F, 9F.)  The claimant's treating physician, Christopher J. Smith,
> M.D., also submitted a medical assessment finding that the claimant was
> incapable of performing sedentary work activity on a regular and
> continuing basis due to her severe exertional impairments.  (Ex. 16F.)
> These extreme limitations are inconsistent with the claimant's limited
> treatment, lack of follow-up, and medical progress reports.  Specifically,
> the claimant's surgical interventions to address claudication resulted in
> discharge in stable condition with minimal pain.  The claimant's residual
> pain was well controlled with medications.  (Ex. 2F at 40-41.)  While
> receiving treatment, the claimant was able to work and care for others.
> More recently, despite repeated recommendations from her providers, she
> failed to make appointments or follow up with anti-coagulation therapy or
> meetings with specialists to manage her conditions.  (Ex. 31F at 36-37, 62,
> 67, 86, 97.)  The claimant's own statements regarding her daily activities
> belie the assessments of her treating providers as she was able to perform at
> least sedentary work activity for twenty-five hours each week in addition to
> her duties taking care of herself and her own child.  Her providers did not
> note that she appeared disheveled or ill-cared for in office visits.

(Tr. 2057-2058.)

The Court finds the ALJ failed to properly evaluate the opinions of Drs. Smith and Alexander. As noted above, an ALJ must provide "good reasons" for declining to assign a treating source opinion controlling weight. While the ALJ did provide reasons for discounting these opinions, they are not supported by substantial evidence.

In particular, the ALJ discounted these opinions on the basis they were "inconsistent with [Hernandez's] limited treatment." (Tr. 2057.) However, the ALJ does not explain how Hernandez's treatment was "limited" in nature. Indeed, a review of the 2,000 plus pages of evidence reveals Hernandez underwent eight different surgeries, had multiple emergency room visits, was hospitalized eight times, had physical therapy, required a wound vac and a PICC line, and received home healthcare services for the bulk of the relevant period. (Tr. 454, 404, 399, 396, 387, 544, 587, 668, 665, 657, 658, 923, 1060, 1061, 1248, 1463, 1432, 961, 943, 1495, 1501.) The ALJ provides no explanation as to how this extensive amount of treatment, which supports the highly restrictive opinions of Drs. Alexander and Smith, can be viewed as "limited."

The ALJ also discounted the opinions of Drs. Alexander and Smith on the basis of Hernandez's "lack of follow up." (Tr. 2057.) The ALJ observed Hernandez had "failed to make appointments or follow up with anti-coagulation therapy or meetings with specialists to manage her conditions." (Tr. 2057-2058.) This minimal discussion fails to recognize that while Hernandez stopped visiting her specialists and taking her anticoagulation medications in 2016 and 2017, from 2012 – 2015, Hernandez was repeatedly in the hospital, undergoing surgery, or visiting with her vascular surgeons. She also diligently took her anticoagulation medications, attended physical therapy, and received home healthcare during that time period. Moreover,

even if Hernandez became non-compliant in 2016 and 2017, this does not necessarily mean she no longer had severe physical restrictions.  Indeed, Hernandez's treating physician during 2016 and 2017, Dr. Jones, also provided an opinion very similar to the opinions of Dr. Alexander and Smith.  Dr. Jones found these significant restrictions despite the fact she was continually encouraging Hernandez to resume regular treatment with her specialists.  Moreover, Hernandez continued to require home healthcare in 2016 and 2017, despite not regularly seeing her physicians.

The ALJ also observed the "extreme limitations" offered by Drs. Alexander and Smith were inconsistent with Hernandez's "medical progress reports."  (Tr. 2057.)  The ALJ noted Hernandez's "residual pain was well controlled with medications" and the "surgical interventions to address claudification resulted in discharge in stable condition with minimal pain."  (*Id*.)  In support of this, the ALJ cites to Hernandez's March 2013 hospital admission, during which Hernandez underwent a bypass and graft in her right leg.  (Tr. 399.)  It is true Hernandez's condition was improved and she had minimal pain upon discharge in March 2013.  However, following this hospitalization, Hernandez required several additional surgeries, developed osteomyelitis in her right heel, and required IV antibiotic treatment.  (Tr. 387, 587, 669, 655, 611, 1061, 1248, 1501.)  In fact, a year later, in March 2014, Hernandez was hospitalized for a balloon angioplasty and a "threatened limb."  (Tr. 1060, 1061.)  She was unable to fully bear weight on her right leg for months following this procedure and required home healthcare assistance.  (Tr. 1060, 1449, 961.)

The ALJ does not sufficiently explain how, in light of the multiple complications and procedures related to Hernandez's legs, simply noting she was discharged in "stable condition

with minimal pain" in March 2013 supports discounting the opinions of her treating physicians. The Sixth Circuit has made clear an ALJ's conclusory and unexplained statement a treating physician opinion is inconsistent with the medical evidence of record, does not constitute a "good reason" for purposes of a rejecting an opinion. *See, e.g., Friend v. Comm'r of Soc. Sec.,* 375 Fed. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

Finally, the ALJ reasoned these opinions were inconsistent with Hernandez's ability "to work and care for others" and her "own statements regarding her daily activities." (Tr. 2057-2058.) While Hernandez did babysit her niece's children in 2014 and 2015, the testimony and record reveals she required significant assistance in doing so. Indeed, Hernandez testified her older daughter would help for care for the children and she would use the food prepared by her home healthcare aide to feed them. (Tr. 63, 68.) Moreover, while Hernandez did have custody over one of her niece's children, she eventually relinquished custody because she could no longer physically care for her. (Tr. 2081-2082.) While the ALJ focuses on Hernandez's attendance at one church conference in 2015 and a trip with her family to Connecticut, the ALJ dismisses the fact Hernandez has required home healthcare for the majority of the relevant period. (Tr. 2056.) Home healthcare certifications confirm Hernandez required assistance with personal care, bathing, dressing, light housekeeping, laundry, and meal preparation. (Tr. 923, 961, 953.) In June 2014, it was noted Hernandez exhibited "considerable [and] taxing effort to leave [her] home." (Tr. 961.)

In addition, the ALJ fails to discuss the doctors' conclusions that Hernandez's condition would result in absenteeism and additional, unscheduled breaks during the workday. (Tr. 1046-1047, 708-709, 715-716.) The fact the ALJ fails to provide any analysis or acknowledgment of these limitations is concerning, as Hernandez's persistent vascular issues have resulted in hospitalizations, extensive therapy, and surgeries, all of which would likely result in absences from work. Because the ALJ did not provide any analysis in relation the doctors' opinions on Hernandez's likely absences, this Court is unable to discern if this portion of the opinion was discounted or overlooked.

In sum, the ALJ's decision fails to set forth good reasons for discounting the opinions of Drs. Alexander and Smith. Accordingly, the Court finds a remand is necessary, thereby affording the ALJ the opportunity to sufficiently address the limitations assessed by Drs. Alexander and Smith.

Finally, as this matter is being remanded for further proceedings, and in the interests of judicial economy, the Court will not consider Hernandez's remaining arguments.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and REMANDED for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**


          *s/Jonathan D. Greenberg*
          Jonathan D. Greenberg
          United States Magistrate Judge

Date: July 29, 2019